UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BANCO POPULAR DE PUERTO RICO, INC.<br>  Plaintiffs<br><br>VS.<br><br>LATIN AMERICAN MUSIC CO., INC., ET ALS<br>  Defendants | CIVIL NO. 01-1142 (GAG)<br><br><br><br>COPYRIGHT INFRINGMENT |
| LATIN AMERICAN MUSIC CO., INC.,<br>  Plaintiffs,<br><br>VS.<br><br>BANCO POPULAR DE PUERTO RICO, INC.<br>  Defendants | CIVIL NO. 01-1461 (GAG) |

DEFENDANTS ANGEL "CUCO" PEÑA AND ALTAMAR MUSIC'S
MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

Come now, defendants ANGEL "CUCO" PEÑA and ALTAMAR MUSIC, by their undersigned attorney ask the court to render summary judgment against plaintiffs, as authorized by Federal Rule of Civil Procedure 56.

**I. INTRODUCTION**

In the use of correct adjudgment methodology, before this litigation is considered a copyright infringement case, the LAMCO parties must establish that they own the rights over the song "I'll Never Get Back to Georgia" a/k/a "El Pito" (hereafter "El Pito"). The present Summary Judgment motion is premised on the fact that LAMCO has survived the threshold issue of ownership involving the PEER parties. If the PEER parties are deemed sole owners of the song, the case ends

and the present motion would become moot. *A contrario sensu*, if LAMCO is declared the owner, or part owner, only then this motion should be entertained by the Honorable Court.

1. The Banco Popular de Puerto Rico (BPPR) commissioned the production of the special "Con la Música por Dentro, 100 Años de Historia", to codefendnat Angel Cucco Peña under a work for hire agreement. Peña included in the production of the album the song "Estamos en Todas Partes", as joint author with Tato Rossy. This song was fused to the end of the special's version of the song "El Pito". LAMCO, as beneficial owner of Jimmy Sabater ownership rights over the musical work (Hereafter LAMCO), alleged sole authorship over the song "El Pito" and filed suit against Peña and his publishing company Altamar. LAMCO alleged succinctly, that the fusion of the two songs amounted to a creation of a derivative work based on the song "El Pito" without authorization from LAMCO.

2. The distribution of the special including the merged song has led to this lawsuit for copyright infringement.

3. In addition, plaintiff Sabater, who coauthored the song "El Pito" with Joe Cuba, through his alleged publisher, plaintiff LAMCO, claims he wrote the song and never gave BPPR permission to use it. BPPR maintained, *inter alia,* that the composer was only a co-author and that it had the authority to use the song through a license obtained from the other songwriter's publisher EMI and from LAMCO itself impicitly. The main issues here with regard to Peña are: whether the Peer parties[1] or LAMCO own the rights to the song "El Pito". In view of the existence of a joint authorship, whether composer Sabater or LAMCO held the copyright to the song by themselves or whether Joe Cuba together with the Peer Publishers shared it with songwriter Sabater as a co-authors or co-owners.

## II. UNCONTESTED FACTS

4. A Statement of uncontrovberted facts has been filed pursuant to L.Cv.R. 56(b).

5. Since 1993, BPPR has annualy produced Christmas music specials which are broadcast on Puerto Rican television and radio, and distributed as audio and audiovisual works. (*See* Docket #1, Banco Popular's Complaint, ¶¶ 18-19).

---

[1] Peer International Corporation, Peer International Corporation of Puerto Rico, Peer Music Ltd., Broadcast Music, Inc., EMI Park Groove, Inc., Sonido Inc., and EMI Catalogue Partnership.

2

6. In and around 1996, LAMCO represented to BPPR that LAMCO and its purported music licensing organization, ACEMLA, owned rights to many of the musical works used in the Specials. (*Id*, at ¶¶ 24, 27).

7. BPPR subsequently learned that the Peer Parties in the present case had claimed rights to many of the works claimed by LAMCO/ACEMLA. (*Id*, at ¶¶ 26, 30-34, 37).

8. In January 2001, BPPR instituted the present action seeking a declaration as to the ownership of as many as several dozen musical works that were used in the Specials. (*Id*, at WHEREFORE clause, ¶ 1, pg.14).

9. LAMCO/ACEMLA identified twenty four (24) songs for which it claimed ownership. The Peer Parties claimed ownership of fourteen (14) of the twenty four works. (*See* Docket #268)

10. The list was later narrowed to eight (8). *Id*.

11. The list was further to six (6) works, amongst which was included "El Pito". *Id*.

12. Ownership of these (6) works including "El Pito" is still in dispute. (*Id*, at ¶ 5).

13. In 1966, Jimmy Sabater and Joe Cuba, co-authors of "El Pito", signed a Popular Songwriters Contract with Cordon Music, Inc. (predecessor to EMI), wherein they transferred to Cordon Music the original and renewal terms of the copyright ownership to "El Pito". (*See* Exhibits 1 and 2).

14. Jimmy Sabater stated under oath that "in 1966, I signed two popular Songwriters contracts with Cordon Music Corp. assigning my copyrights in "Bang Bang" and "El Pito (I'll Never Go Back to Georgia) to Cordon Music Corp." (*See*, Exhibit 3, Affidavit of Jaime Sabater, dated May 8, 2009, ¶7).

15. Cordon registered the copyrights to "El Pito" in 1966 and did the same for "Bang Bang" in 1967. The registration for "Bang Bang" named both Cuba and Sabater as coauthors and stated that the works were first published in 1966. (*See* Exhibits 4 and 5).

16. Registration for "El Pito" was corrected in 1967 to include both Sabater and Cuba as its co-authors. (*See* Exhibit 6).

17. On January 26, 1994, Cordon's successor-in-interest, and EMI's predecessor-in-interest, Windswept Pacific Entertainment Co., renewed the copyrights to "El Pito" in the name of authors. (See Exhibit 7).

18. Raul Bernard, president of LAMCO/ACEMLA testified that any renewal registrations made on January 26, 1994 would have appeared in the Copyright Office's public records, and that there existed "red flags" of prior claims that should have forced LAMCO/ACEMLA to conduct an investigation in the Copyright Office. However, Mr. Bernard did not recall if a search had been done. (*See* Exhibit 8, Bernard Deposition Transcript, at 146:12-147:23; 198:19-199:3). Other pertinent and related excerpts of the transcript of Mr. Bernard's deposition testimony are attached hereto as Exhibits 9 and 10.

19. Mr. Sabater purportedly assigned his rights to several songs, including "El Pito" and "Bang Bang," to LAMCO on April 3, 1997, and LAMCO recorded those purported assignments on April 8, 1997. (*See* Exhibit 11).

20. LAMCO purported to register copyrights for these works, naming only Sabater as the author on March 30, 2001. (*See* Exhibit 12).

21. Mr. Sabater acknowledges that he was "aware that the music publisher identified as the copyright owner of both 'I'll Never Go Back to Georgia' and 'Bang Bang' as EMI Music" and that he has "seen EMI listed on BMI royalty statements to me for many years including the years before I left BMI in 1998." (*See* Exhibit 3, *supra*, at ¶ 7).

22. Mr. Sabater further testifies to having "also received royalty statements and payments from EMI Music for many years. These statements and payments include monies for 'Bang Bang' and "El Pito". On statements from both BMI and EMI I have seen that Joe Cuba has been identified as co-writer with me on both 'I'll Never Go Back to Georgia' and 'Bang Bang.'" (*Id*, at ¶¶ 8, 9).

23. BMI has listed EMI as a publisher and Cuba and Sabater as co-authors of "El Pito" aka "El Pito" in its public performance royalty statements. (*See* Exhibit 13).

24. Furthermore, EMI royalty statements sent to Sabater for nearly the past ten years list Cuba and Sabater as co-authors of "Bang Bang" and "El Pito". (*See* Exhibits 14 through 24).

25. Mr. Bernard testified that when he signed the purported assignment with Jimmy Sabater, he knew of Sabater's involvement with BMI and his assignments regarding "El Pito". Mr. Bernard further stated and that Sabater may have been paid publication royalties for "El Pito" starting in the 1960s. (*See* Exhibit 8, at 132:11-21; 191:24-192:3).

26. A search by ACEMLA/LAMCO of BMI's music catalogue would have revealed that EMI was the publisher of "El Pito" with Sabater and Cuba as co-authors of the song. (*See* Exhibit 25).

4

27. Mr. Bernard acknowledged that Cuba had claimed co-authorship of "El Pito" and may have been collecting royalties "for many years." (*See* Exhibit 8, at 154:12-155:3).

28. At the time of Sabater's purported assignment to LAMCO of the copyrights to "El Pito", LAMCO was on notice of Cordon's (EMI's predecessor in interest) earlier ownership claims to those songs, and LAMCO did not take the purported assignment in good faith.

29. Mr. Joe Cuba passed away on February 15, 2009 (*See* Exhibit 26, New York Times web page print out).

30. Banco Popular made a monetary consignment for the double claim that included the song "El Pito". (See Docket #25).

### III. APPLICABLE LAW

#### A. Copyright Infringement Case Requirements

A plaintiff alleging copyright infringement must establish two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. An individual copies another's work for purposes of copyright law if he plays it publicly or distributes copies without the copyright owner's authorization. *See, E.g.*, <u>Feist v. Rural Tel.</u>, 499 US 340 (1991).

Regarding ownership, defendant Angel "Cucco" Peña formally adopts by reference the arguments relating to ownership stated in the Peer Parties's Motion for Summary Judgment (*See* Docket #328). The Peer Parties' argument succinctly states that Mr. Sabater does not have ownership of the song "El Pito" due to a contract transferring the rights to the song to them and for other legal reasons expounded in the dispositive motion in relation to section 205 of the copyright act. (17 USC sec. 205)

#### B. Co-authorship, Statute of Limitations and Laches

Even assuming *arguendo* that Lamco has a co-ownership of the song "El Pito", the claim would be barred from prosecution for infringement because BPPR has a non-exclusive license from the Publisher of the joint author Joe Cuba. In addition, at this point in time, the co authorship presumption cannot be rebutted by LAMCO because it would be barred by the copyright statue of limitations and laches.

#### 1. Joint Authors

Under 17 U.S.C.S. § 201(a), the authors of a joint work are co-owners of copyright in the work. In other words, the joint authors hold undivided interests in the work, despite any

5

differences in each author's contribution. The benefits of co-authorship are therefore significant: each author may use or license the joint work. Janky v. Lake County Convention and Vistors Bureau, 2009 U.S. App. LEXIS 17207.

"Copyright of a work… initially vests in the author or authors of the work." 17 U.S.C. § 201 (a). A "joint work: is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or independent parts of a unitary whole." *Id*, at §101. The authors of a joint work are considered co-owners of copyright in the work. *Id*, at § 201(a). The test for joint authorship consists of two parts; (a) the contributions are each independently copyrightable; and (b) the authors intended to be joint authors at the time the work was created. *See, E.g.*, Childress v. Taylor, 945 F.2d 500 (2d Cir. 1991); Ericksons v. Trinity Theatre, Inc., 13 F.3d 1061 (7th Cir. 1994); Rubloff, Inc. v. Donahue, 31 U.S.P.Q.2d 1046 (N.D. Ill. 1994).[2]

As tenants in common, each joint author possesses an equal, undivided interest in the whole, absent a signed writing to the contrary, and regardless of the extent of the contribution. *See* Papa's-June Music, Inc. v. McLean, 921 F. supp. 1154, 1157-58, 39 USPQ2d 1124 (S.D.N.Y. 1996). Each joint author may utilize the work herself without the other joint author's permission, sue for third-party infringement without joining other co-owners, and grant non-exclusive licenses. *See, E.g.,* Williams v. ARC Music Corp., 121 F.3d 720 (9th Cir. 1997); Batiste v. Island Record, Inc., 179 F.3d 217, 222-23, (5th Cir. 1999), *cert denied*, 528 U.S. 1076 (2000); Thomson v. Larson, 147 F.3d 195, 202 (2d Cir. 1998). Furthermore, a joint author is immune form an infringement claim by other joint authors. *Id* at 200. *See also* Carroll v. Kahn, 68 USPQ2d 1357, 1360 (N.D.N.Y 2003). Likewise, a valid license immunizes the licensee from copyright infringement provided that the licensee uses the copyright as agreed upon with the licensor. *See, E.g.,* John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 40, 66 U.S.P.Q. 2d 1065 (1st Cir. 2003); Graham v. James, 144 F. 3d 229, 236, 46 U.S.P.Q. 2d 1760 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement").

---

[2] The legislative history clarifies this definition considerably: Under the definition in section 101, a work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit, although the parts themselves may be either "inseparable" (as [in] the case of a novel or painting) or "interdependent" (as in the case of a motion picture, opera, or the words and music of a song). H.R. Rep. No. 94-1476, 94 th Cong. 2d Sess. 120 (1976).

In fact there is no legal obligation requiring one joint owner to give the other prior notice before exploiting the work itself. *See* Thomson, *supra*. This means that if a work is registered as a joint work, and one of the authors has licensed the song, the other author must rebut the presumption of joint authorship to successfully bring suit. *See* Carroll and Janky, *supra*.

Any of the copyright co owners in joint works is free to exercise any of the rights of a copyright owner without permission of the other joint owner, always bearing in mind the duty to account to said co owners for any profits resulting from direct use or licensing. *See, E.g.*, Oddo v. Ries, 743 F. 2d 630, (9th Cir. 1984); Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569 (2d Cir. 1955), modified 223 F.2d 252 (2d Cir 1955). Concesion of ownership implicates a division of profits from the copyrighted work, resulting in lack of issue of copyright law, with the suit for accountability arising under state law, similar to the case where a party seeks enforcement of a copyright license. Gaiman v. Mcfarlane, 360 F.3d 644, 69 U.S.P.Q. 2d 1946 (7th Cir. 2004).

As it can be seen, "[i]t follows inexorably that the co-owner of a copyright is incapable of infringing the copyright vis-à-vis his counterpart co-owner." Warren Freedenfeld Assocs. v. McTigue, 531 F.3d 38, 47-48 (1st Cir. 2008).

**2. The Burden of Proof**

Copyright registration certificates obtained within five years of first publication of the underlying work are *prima facie* evidence of the validity of the copyright and the facts stated therein, including ownership; thereafter, the evidentiary effect of the certificate is within the court's discretion. *See, e.g.*, 17 U.S.C. § 410(c); Eckes v. Card Prices Update, 736 F.2d 859 (2d Cir. 1984); Johnson Controls, Inc. v. Phoenix Control Systems, Inc., 886 F.2d 1173 (9th Cir. 1989). The presumption under §410, *supra*, is not conclusive; it merely shifts the burden of proof. Carol Barnhart, Inc. v. Economy Cover Corporation, 594 F. Supp. 364 (1984). *See also* Seiler v. Lucasfilm, Ltd, 808 F.2d 1316 (9th Cir. 1986), *cert. denied*, 484 U.S. 826 (1987).

**3. The Three Year Statute of Limitations**

In the case of Santa-Rosa v. Combo Records, 471 F.3d 224 (1st Cir. 2006) the First Circuit held that a claim for declaratory judgment of ownership under the Copyright Act accrues when the plaintiff knows of the alleged grounds for the ownership claim. *Id* at 227. The First Circuit affirmed dismissal of a singer's designation of ownership claim, reasoning that the plaintiff's designation of ownership claims accrued as soon as he finished recording each album. *Id* at 228. The presentation of the complaint more than 15 years later was untimely under the statute.

**4. The Laches Doctrine**

The laches doctrine is based on the maxim that equity aids the vigilant, not those who sleep on their rights. Laches is an equitable defense to be used when plaintiff's delay is unreasonable, inexcusable and prejudicial to the defendant. Mere delay is not enough and prejudice may not be presumed form the inordinate delay in bringing suit. *See, E.g.*, Hoste v. Radio Corp. of Am., 654 F. 2nd 11 (6th Cir. 1981); Jacobsen v. Deseret Book Co., 287 F.2nd 936 (10th Cir.), *cert. denied*, 537 U.S. 1066 (2002).

A successful laches defense requires an unreasonable or inexcusable delay. Delay may be held excusable if until the time of filling plaintiff had no certainty as to the rights he possessed, Murphy v. Timberlane Regional School District,973 F 2nd 13 (1st Cir. 1992), or that the enforcement of the copyright was not worth the cost of litigation at a certain point in time. Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 456 F. Supp 531, 534 (SDNY 1977).

Although the First Circuit has not specifically addressed the issue of laches in the copyright infringement context, the majority of circuit courts that have addressed the issue have applied laches to such claims. *See, E.g.*, Chirco v. Crosswinds Communities, Inc., 474 F.3d 227, 236 (6th Cir. 2007); Jacobsen v. Deseret Book Co., 287 F.3d 936, 949 (10th Cir. 2002); Danjaq L.L.C. v. Sony Corp., 263 F.3d 942, 951 (9th Cir. 2001); Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 165 (2d Cir. 2003); Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 942 (7th Cir. 1989).

Moreover, the laches defense can be used to bar an action for declaration of authorship. Jackson v Axton, 25 F.3d 884 (9th Cir. 1994). In this case a request for declaration of authorship was barred due to laches because it was brought more than 20 years after the song was composed. Furthermore unlike the infringement context a plaintiff cannot assert a new unbarred ownership claim each time the defendant exploits the song because disputed events regarding authorship took place more than 20 years ago and could not be revived. *Id*.

As a general rule, if a plaintiff's delay results in the disappearance of evidence, the death or unavailability of witnesses or similar procedural impediments to the defendant's ability to receive a fair adjudication of the claims against it, the laches defense is very likely to succeed. *See, E.g.*, Ory v. McDonald, 68 USPQ2d 1812 (C.D. Cal. 2003), aff'd, 2005 U.S. App. Lexis 15775, 75 USPQ2d

1605 (9th Cir. 2005), Nesome v. Brown, No. 01 Civ. 2807, 2005 U.S. Dist. LEXIS 4088, 75 USPQ2d 1903 (S.D.N.Y. Mar. 16, 2005).[3]

Evidentiary prejudice has been held where contemporaneous documents had been destroyed and key witnesses were deceased. Mappa Music Co. v. Universal-Polygram Int'l Publ'g, 62 USPQ2d 1582 (C.D. Cal. 2002)… defendant by reason of dulled memories and the destruction of relevant records, Watermark Publisher v. High Tech Sys. Inc., 44 USPQ2d 1578 (S.D. Cal. 1997).

## IV. DISCUSSION

### A. LAMCO is Barred from Filing Copyright Infringement

Joe Cuba was a joint author of the "El Pito". He appears as such in the copyright office registration records that date back to 1966. These records also reflect that the rights to the song in question where transferred to Cordon Music Inc. (predecessor to EMI who is one of the Peer Publishers). Sabater, as original coauthor, has corroborated the same through his most recent averments. In essence, Sabater acknowledges in his sworn statement that he has accepted payments as coauthor, that he knew that Cuba was given credit as coauthor and that Cuba received part of the payment for royalties through the years in consideration of his joint authorship. The Cuba's ownership rights over the musical composition "El Pito" today are in possession of one of the Peer Publishers (EMI).

Peer, presently in possession of Cuba's ownership rights, has authorized BPPR the use of the song "El Pito" in the 1999 Christmas Special. BPPR has consigned the royalty payments afforded to the use of the song in an effort to facilitate payment for royalties to whomever is awarded ownership rights. The bank having been licensed by one of the publishers holding the rights of Cuba, is immune from the copyright infringement claim filed by LAMCO. *See* Carroll and Janky, *supra*. If LAMCO wishes to receive royalties, a state court action must be filed against Peer. As a result, this Honorable court has no jurisdiction to entertain the present complaint since it is not arising under the federal copyright law. Accountability for joint author royalties is a state court matter case. *See* Oddo and Shapiro, *supra*.

---

[3] In the case of Ory during the plaintiff's 30-year delay in pursuing her claim, the composer of the 1921 song at issue died, as did all surviving musicians who might have been involved in the process of composing the song, thus making it impossible for the defendant to investigate the degree to which the song was in fact original. Moreover, old sheet music, which the composer had reportedly used as inspiration or source material for his melody, had been lost. Under those circumstances, a finding of laches was not difficult to make since defendant was prejudiced by loss of evidence.

### B. Sabater's Sole Authorship Claim is Time Barred

As evinced, the copyright office records show that Cuba and Sabater are coauthors of the song "El Pito". A timely registration, as the one in this case, constitutes *prima facie* evidence of the existence of the joint authorship. This registration creates the presumption that the song "El Pito" was the product of a joint work. If Sabater wishes to claim sole authorship of the song, he must first rebut the presumption created by the registration. *See* Carroll and Janky, *supra*. In addition, the declaration of sole ownership sought must be timely under the copyright statue of limitations.

The present case before the court would be time barred in view of the Santa Rosa v Combo pronouncements, *supra*. The reason is simple: Sabater can't rebut the presumption of a joint-authorship product in the registration more than 40 years after the song was created. Sabater himself has sworn to the fact that he was aware of the fact that Cuba was included as a joint author of "El Pito" when the registration was made and thereafter, when he received the payments from the publisher, which divided the royalties between Cuba and himself. So it would be fair to say that Sabater was cognizant of the grounds to file his declaration of sole authorship claim against Cuba since the mid 60's. His ownership designation of claims accrued at the very least more than 40 years ago. Consequently any declaration of ownership by Sabater, which must precede the presentation of the instant complaint by LAMCO, would be time barred. The coauthorship presumption cannot be rebutted, for an action requesting sole authorship would be untimely.

### C. A Declaration of Ownership is also Precluded by Laches.

Lets assume for a moment that this Honorable Court determines that a declaratory judgment action by Sabater seeking sole authorship would not be time barred. Under that factual scenario, the action would be precluded by the doctrine of laches. We elucidate.

It is undisputed that Sabater had knowledge since the mid 60's that Cuba had been credited with the joint authoship of "El Pito" and received royalties thereafter as coauthor. Forty years have transpired since Sabater has had this information and the song was composed. The fact that forty years constitutes legally an inexcusable delay is beyond per adventure. Thus to configure the doctrine of laches defense in the case at hand, the only element yet to be proven is prejudice.

The delay in this case is prejudicial to Peña, primarily because the coauthor of the song Joe Cuba expired on February 15, 2009 (*See* Uncontested Fact #29, *supra*). The evidentiary prejudice here comes in the form of unavailability of the key witness to the creation of "El Pito" song, Joe Cuba. Most of the surviving musicians who recorded the original version of the song have also died. This makes impossible for Peña, the defendant in the consolidated case, to investigate the degree to

10

which the song in fact was a joint authorship. Consequently a determination of laches is somewhat facilitated in this case because due to the unreasonable delay, the defendant in this case has lost the opportunity to summon a key witnesses among others the deceased Joe Cuba.

### V. MOTIONS FOR SUMMARY JUDGMENT

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

In a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2253, 91 L. Ed. 2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See, E.g., Anderson; Celotex; Goldman, *supra*.

WHEREFORE, Defendants Angel "Cuco" Peña and Altamar Music respectfully request that this Honorable Court grant this Motion for Summary Judgment pursuant to Rule 56 and further relief as this Court deems necessary, just and proper.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, on this 27th day of August, 2009.

I HEREBY CERTIFY: that on this date, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all parties in the case; Prado, Nunez & Assoc.'s, Edwin Prado-Galarza; 416 Ponce De Leon Ave, San Juan, P.R. 00918; Roberto Suiero Del-Valle, Isreal Melendez Torres , P.O. Box 270331, San Juan, P.R. 00927-0331; , Jean Paul Vissepo Garriga, Ave Roosevelt, Esq. Antolin, No. 401, San Juan, Puerto Rico 00918; Francisco Ramos Martinez, 403 Del Parque Street, San Juan, P.R. 00912; Attorney PHV Barry Slotnick, Esq., Attorney Katarina Syipex-Rubio, Attorney Samuel Pamias-Portalatin; Attorney Edgardo Colon Arraras; and to Josè L. Barreto Rampolla, PO Box 9023880, San Juan, Puerto Rico 00902-3880.

S/FREDDIE O. TORRES GOMEZ
USDC No. 226409
Tulipán 170
Urb. San Francisco
San Juan, Puerto Rico 00927-6221
Tel. 753-4712 Fax
Ftorres151@gmail.com
